Commonwealth *v.* Wilmer, Appellant.

Argued March 21, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*A. Benjamin Johnson, Jr.,* for appellant.

*Joseph M. Smith,* Assistant District Attorney, with him *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, P. J., June 17, 1966:

The appellant, Finley Wilmer, was found guilty and sentenced by the court below on charges of aggravated assault and battery and rape.

The facts, viewed in the light most favorable to the Commonwealth, were as follows: At approximately 10:45 p.m. on May 7, 1965 two Philadelphia police officers, while on routine patrol, heard a woman screaming in the vicinity of 4th and Poplar Streets, Philadelphia. The officers were in a patrol car. They drove to a vacant lot at 852 North 4th Street and swung the patrol car onto the lot itself. Officer Routzahn testified: "I then swung my car into the vacant lot with my bright lights on, at which time approximately about 50 feet into the lot I observed a white female lying on her back, completely nude, her legs spread apart, with a colored man on top of her with his pants down, in between her legs, in a motion up and down as though he was having sexual intercourse, at which time the defendant jumped up, when he seen our head lights."

The officer further testified that when appellant noticed that police had arrived, he jumped up and ran towards the back of the lot. However, it appears that there was a cyclone fence across the back of the lot which effectively prevented the defendant's escape. He turned and charged towards the police officers. They subdued him and took him into the divisional police headquarters. The officer testified that he and his partner found a woman's coat on the sidewalk in front of 852 North 4th Street, a torn skirt on the sidewalk of 850 North 4th Street, and a woman's shoe, a woman's handkerchief, a woman's blue slip, a woman's empty change purse, a half set of woman's pearls and a pair of woman's yellow pants in various places on the vacant lot. He testified that each of these articles was bloodstained.

Officer Routzahn's partner, Officer Holmes, testified that as the police car drove onto the lot, "Well, I observed the defendant, Finley Wilmer, about halfway back in the lot was straddled between the legs of the complainant, Mrs. Dougherty, who was completely

nude. He was straddled between her legs and with his pants down he was going in an up and down motion.

"We pulled the car onto the lot and I proceeded to get out of the car with a flashlight to go towards him. And he turned around and he saw us. And he got up. And as he was getting up, he pulled his pants, and he started to run for the rear of the lot.

"And at the rear of the lot there is a cyclone fence. And he seen he couldn't scale the cyclone fence, and he came around, and he came at Officer Routzahn and myself with both arms swinging. And we subdued him and cuffed and called for two radio patrol wagons . . . ."

The victim, Catherine Dougherty, testified that all that she could remember was that while walking along Poplar Street, she was grabbed from behind and dragged and beaten over the head, as a result of which she was hospitalized for some ten days. Mrs. Dougherty also testified that she had not had sexual relations with anyone within the two weeks immediately preceding the incident.

Dr. Harnish Shah testified that he was on duty in the Accident Ward of St. Luke's Hospital the night of the incident and that he treated Mrs. Dougherty. He testified that Mrs. Dougherty had a "big contusion on the left side of the face" and a cut on the left side of the chin which required two stitches to close. He testified that Mrs. Dougherty was bleeding only from the cut on the chin and he further testified that he found male spermatozoa some three inches deep in the patient's vaginal cavity.

The appellant argues that the evidence was not sufficient to sustain a conviction and that the conviction was the result of coercion by the trial judge. A reading of the evidence in this case is sufficient to convince any fair minded person of its sufficiency.

The appellant took the stand in his own behalf and testified that while walking along the highway he no-

ticed the prosecutrix lying on the ground, obviously in need of help and that he went to her assistance and while kneeling at her side, was discovered by the police.

The jury retired to deliberate at 4:38 p.m. and returned to the courtroom at 5:51 p.m. because they wished further instructions. Counsel for the appellant argues that the colloquy which then took place between the jury and the trial judge coerced the jury into bringing in a verdict of guilty. We have carefully reviewed the entire record and cannot agree with this argument.

The trial judge, Hon. EDWARD J. GRIFFITHS, time after time made it clear to the jury that the question of credibility or believability was the real issue in the case for their determination. He made it crystal clear that if they believed that the Commonwealth's officers were telling the truth beyond a reasonable doubt, they should bring in a verdict of guilty or if they believed, on the other hand, that the officers were not telling the truth and that the defendant was, they should bring in a verdict of not guilty. The lengthy colloquy between the trial judge and the jury is printed in footnote 1.[1]

---

[1] "THE COURT: Yes, Madam Forelady.

"THE FORELADY: Your Honor, the Jury has decided they would like to have more evidence concerning this case.

"THE COURT: What do you mean by more evidence?

"THE FORELADY: Well, we have received evidence from the client as far as a physical or some evidence of clothing. And we would like to have evidence as far as the defendant is concerned and his clothing at the time of the scene or the incident.

"THE COURT: Well, see, the Commonwealth presents their evidence, and then the defense presents evidence for the defense, and that's the evidence in the case. The Commonwealth rests its case. The defense rests its case. And that's the evidence in the case. Now, it is primarily a question of identification. You don't need any more evidence in this case as such. Did the officers identify this defendant in the position that's been described in relation to the prosecutrix? And if they did, it's pretty difficult for the defendant to explain that away. If you believe that the officers saw this defendant between the legs of this prosecutrix, and if you be-

## The jury wanted the pants which the defendant wore

lieve that the officers testified truthfully, honestly, what they saw, that his trousers were down, if you believe that, that's enough evidence to convict this defendant.

"Now, if you say no, the officers were not telling the truth, the officers apprehended him, sure, they caught him there, but they didn't see him in this uncompromising position, they just said they did, they are lying, these officers, if you say that, why, then, your verdict ought to be not guilty. But we are human beings, and you are all adults, and many of you are married. I don't know how many of you are single, but just use your common experience as married persons. You don't have to stretch your imagination any. Look at these things with a sober mind. Now, either you believe the officers or you don't believe them. The defendant in effect says I was there, I admit that, but the officers came up and grabbed me and falsely accused me of raping this woman, which isn't true, he says. He says the officers lie about it. He says his trousers were not down. He said he wasn't between the legs of the prosecutrix. He says his flies were not open at the time he was apprehended. He says he didn't run. And he says, as I told you before, in effect I was a good samaritan. I came to the rescue of the woman in distress. Now, if you believe that, then you have to say these officers lied, because if anybody comes to the rescue of a woman in distress, he is not going to put his body between her legs, a naked woman.

"He admits she was naked there. He didn't take off his coat and cover her. It seems to me if any of you came upon a woman in distress naked lying on the ground, you would take off anything you had about you and out of common decency cover her with what you had. He didn't do that. Now, he didn't have to do that. It wasn't required that he do that. But it certainly wasn't required that he put his body between her legs and take his pants down if he is coming to rescue her. So it's primarily a question of believing or not believing the officers. You don't need any more evidence in the case. You have all the evidence you need. We can't recall witnesses now and bring them back on the stand. The trial is over.

"You decide on the basis of the evidence that you have already heard. My gracious, stand up like men and women, be counted on this thing. Stand up and vote what your own heart tells you is right.

"Now, is there anything further? Any juror may ask any question.

"No. 4 JUROR: Judge,—

at the time of the rape. The Judge told them that the

"THE COURT: Stand up, please, sir. You are Juror No. 4.

"JUROR No. 4: Yes. We would like to know what become of the boy's pants here in case he say he raped her, what become of that, that's what holding us up.

"THE COURT: The boy's pants?

"JUROR No. 4: Yes.

"THE COURT: Well, he admitted that he had trousers on. He didn't say that they were off of him. Now, he didn't produce the trousers.

"JUROR No. 4: That's what's holding us up. We like to know the trousers he had on, the time this lady say she was raped, that's what we want to find out.

"THE COURT: You would like to see the trousers that he had on at the time?

"JUROR No. 4: At the time.

"THE COURT: Well, now, the defendant didn't bring them in. He didn't bring them in, and the police didn't take his trousers off of him for obvious reasons. He wouldn't have any trousers to wear if they had taken them off of him. But if he had taken his trousers down, as has been stated by the police, what would have been shown on the trousers? Maybe some marks from the ground. Maybe they have marks on the ground. But they were down below his buttocks. I assume below the knees. And what would they have shown? They wouldn't have shown anything.

"Do you want to say something else?

"JUROR No. 4: No. That's all, Your Honor.

"JUROR No. 10: Your Honor, what we was wanting to know was if has the same clothes on now that he had on at the time of this time he was accused.

"THE COURT: Well, I don't know the answer to that. That wasn't presented in the case. That could be true or could not be true. He is dressed now to appear in court.

"JUROR No. 10: I see. Yes, I understand.

"THE COURT: And he could have the same suit on or he could not have the same suit on. He didn't say that.

"JUROR No. 10: Is there any way we could get an answer on that?

"THE COURT: No, there isn't, because the case has been closed.

"JUROR No. 10: I see. In other words, we just have to make a decision either yes or no, is that it, on the case?

"THE COURT: Well, I think generally speaking not yes or no, but guilty or not guilty on each of the counts.

pants had not been put into evidence and therefore

"JUROR No. 10: Yes, that's what I want.

"THE COURT: But if I may comment, I don't believe it's at all important or relevant as we say in the law whether he has the same suit on or not. You wouldn't examine his suit today most assuredly to see what marks were upon it now when this occurrence happened in May, I believe, of this year. A lot could have happened to the suit. It could have been cleaned; it could have been pressed. The suit, particularly the trousers, there was no evidence, as I recall, that the defendant had a coat on at all. I don't remember hearing any evidence of that. But the trousers could have been torn or could not have been torn. I would say normally a man in the position of having intercourse with a woman does not have his trousers in a position where they are going to be torn. If they are lowered below his buttocks, they are somewhat out of the way.

"JUROR No. 10: Yes, that's right. I thought there would be some remains there that would, you know, if we could see them in that respect. But they are not here, so, therefore, we are—

"THE COURT: That's the situation. Now, as I have already mentioned to you, if the police had said take those trousers off, give us those trousers, then he wouldn't have had any trousers to wear.

"JUROR No. 10: I see, Your Honor. Very well.

"THE COURT: That's the best we can do on that.

"JUROR No. 6: Your Honor, this is what we had regards in to his clothing. The only way that we could come up whether he is the guilty person or not, if he pulled his pants up as the officer stated he did, and he was in the midst of having intercourse with this woman, there should be some form of a discharge or something on some part of his clothing to prove that he was actually having intercourse with her. Then we would know he was the guilty one, because as it was stated, when he saw them, he pulled up his clothing. Well, if he was in the act of intercourse, then there should be some discharge or the medical examination should have shown when he was taken to the hospital that he was—it would show up on his clothing. That's the part, the question is with us, really. We know that she was raped. There is no mistake about that. But we also came to that conclusion. Well, if he pulled his clothing up, and he wasn't just starting, but he was actually having this intercourse, then somewhere on his pants or underwear, which never was stated whether he had on underwear or

could not be produced. He then went into the anatomy

not, but on one or the other there should have been some form stating that there was a discharge.

"THE COURT: I understand what you are requesting. Well, I can see what you have in your minds, and, of course, normally I think that would follow. Of course, you remember that the officers said that he went up and down on her three or four times that they observed. Now, the doctor said that the spermatozoa was in the vaginal tract of the prosecutrix, Mrs. Dougherty, so it's apparent he had an ejaculation. And his spermatozoa went into the body of the prosecutrix. Now, he apparently, you can draw this inference most certainly, continued his motions in order to complete his ejaculation. We are all human beings, and sex is a great urge; and if you are in the act of having intercourse and somebody comes in upon you, the urge to continue the act of intercourse may be greater than any inhibitions to get up and cease having the act of intercourse. Now, it's apparent that he went on with his act of intercourse and completed the ejaculation. When he removed his organ from the body of the prosecutrix, he could have had continued spermatozoa coming from his organ, or he could have left the entire deposit of it within the body of the prosecutrix. Now, if he continued to have an emission of spermatozoa, then presumably it would have soiled his trousers or underwear.

"One of the officers said that he had his flies open, so perhaps it would not have gotten on his garments if that were the case. But, nevertheless, the point remains that you do not have his undergarments, shorts, or whatever he had on, if he had shorts on, nor do you have his trousers to examine. So you just don't have that bit of evidence in front of you. Of course, if you did have his trousers or his shorts, and if you need a doctor then to testify that they were examined and that the spermatozoa evidence was on the garments, you need that type of testimony also. You couldn't just look at them and determine yourselves whether it's spermatozoa. It might be any substance on the garments. But you don't have that type of evidence in this case. You don't have his garments. But you do have in my opinion a sufficiency of evidence here to find him guilty if you believe the testimony of the police officers and the doctor.

"I think it's primarily a matter of believability. Either you believe the one side or you believe the other. While it might have been desirable to have the garments, it certainly isn't essential that you have the garments in order to convict. As I have told

of a rape and tried to explain to the jury why the pants had not been seized by the police officers. He also told the jury that even if the pants had been produced by the defendant, they probably would not show anything at this time. The Judge did everything possible to fully answer the questions of the jurors. Appellant argues that the trial judge expressed an opinion of the guilt of the defendant and that this was reversible error. It is not at all clear that the Judge did express such an opinion but even if he did, such was not improper under all of the circumstances of this case. We

you previously, you don't have to be satisfied beyond all doubt. Every doubt in your mind about his guilt does not have to be removed. You are only required to be satisfied of his guilt beyond a reasonable doubt. A reasonable doubt. Not beyond any doubt. And a reasonable doubt as I have previously charged you is the type of doubt that would cause you to hesitate to act in a matter of importance in your own life. Now, if you are satisfied from the evidence, that based on it you would act in a matter of importance in your own life, then you should find him guilty. If you are not satisfied, you should find him not guilty. But as I view the evidence here, there is sufficient evidence without the trousers for you to find him guilty beyond a reasonable doubt if you believe the police officers and the doctor. You don't need this other evidence that you are speaking about, the garments. It's a matter of believability. You believe one or the other. Either you believe the defendant, that he was a good samaritan and becoming himself a victim of circumstances by reason of trying to help somebody else out when she was in distress, or else he is in fact the man who assaulted her. Now, you either believe one or the other.

"Search your own hearts and do what is right and proper in this case. Whatever you do, bear in mind that you are charged with the responsibility of giving this defendant a fair trial under the law and the evidence, and you are charged with the responsibility of doing what is right and proper for society. Bring in a proper verdict.

"Is there anything further any of you have?

"(No response.)

"THE COURT: Any further questions?

"(No response.)

"THE COURT: All right. You may go out."

quote with approval what Mr. Justice EAGEN said in *Com. v. Ott,* 417 Pa. 269, 272, 207 A. 2d 874: "For the first time, as far as our research discloses, in Commonwealth v. Nafus, 303 Pa. 418, 154 A. 485 (1931), this Court held that a trial judge may also express an opinion as to the guilt or innocence of the defendant. And in many cases since, this right has been reaffirmed, provided (1) that it is exercised fairly and temperately; (2) that there is reasonable ground for any statement the judge may make; and, (3) that he clearly leaves to the jury the right to decide all the facts and every question in the case, regardless of his opinion: Commonwealth v. Raymond, 412 Pa. 194, 194 A. 2d 150 (1963); Commonwealth v. Chester, 410 Pa. 45, 188 A. 2d 323 (1963); Commonwealth v. Patskin, 372 Pa. 402, 93 A. 2d 704 (1953); and Commonwealth v. Watts, 358 Pa. 92, 56 A. 2d 81 (1948)." All of these conditions were complied with in the present case. The vice condemned in the *Ott* case was that the judge stated he had a duty to express an opinion, and in *Com. v. Young,* 418 Pa. 359, 211 A. 2d 440, the vice condemned was that the judge used a phrase which might indicate that he had knowledge, independent of the evidence, which showed guilt.

The writer of this opinion has had twenty-five years' experience as a judge and to the best of his recollection, this is the first rape case in which there was testimony by eyewitnesses of the act. We are of the opinion that the appellant received a fair trial and that the evidence was entirely sufficient to justify a conviction.

Judgment of sentence affirmed.

WRIGHT, J., concurs in the result.

DISSENTING OPINION BY HOFFMAN, J.:

The act of rape constitutes one of the most heinous crimes known to man. It is condemned and reviled in every civilized society. Conviction of this crime sub-

jects the accused to a lifetime of opprobrium and disgrace. The very seriousness of this crime requires, therefore, that the utmost caution be exercised in assuring that the convicted man is in fact guilty.

In the instant case police testified that the victim was bleeding profusely from her eyes, nose and mouth. Her clothes were "soaked" with blood. One police officer testified, however, that to the best of his recollection, he found no bloodstains on defendant's clothing.

It is with this evidence that the jury left the courtroom for deliberation at 4:38 p.m. and returned at 5:51 p.m. In their lengthy colloquy with the trial judge, which is contained in footnote one of the majority opinion, four jurors asked for further evidence with respect to defendant's clothing. The jury was clearly concerned with whether the clothing would disclose a seminal discharge or other stains which would prove that defendant actually had sexual intercourse with the victim. Notwithstanding the jury's hesitancy, the trial judge stated to the jury that they should not consider this point. He told the jury that the pants could be of no evidentiary value and would not aid them in reaching a conclusion on guilt or innocence. Repeatedly, he stated that the jury had sufficient evidence without the trousers to find defendant guilty beyond a reasonable doubt. He actively sought to dispel any doubt which arose from the fact that defendant's clothing apparently did not bear signs of blood or seminal discharge on it. By so doing he improperly withdrew from the jury's consideration a factor which was clearly disturbing them greatly.

This colloquy sufficiently demonstrates to me that the judge usurped the fact-finding function of the jury. For this reason, I would grant a new trial.

SPAULDING, J., joins in this dissenting opinion.